| | | |
|---|---|---|
| REBECCA KINTZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-cv-00507-RK |
| | ) | |
| HAVEN CREEK LIMITED | ) | |
| PARTNERSHIP and SENTINEL REAL | ) | |
| ESTATE CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court are Defendants Haven Creek Limited Partnership and Sentinel Real Estate Corporation's motion for sanctions for spoliation of evidence, (Doc. 134), and Defendants' motion for summary judgment, (Doc. 139). The motions are fully briefed. (Docs. 134, 138, 140, 142, 145, 148.) After careful consideration, and for the reasons explained below, the Court **ORDERS** that Defendants' motion for sanctions for spoliation of evidence is **GRANTED in part** and **DENIED in part**, and Defendants' motion for summary judgment is **DENIED**.

### Background and Procedural Posture

Plaintiff alleges that an apartment she rented from Defendants was (or became) infested with harmful and toxic mold, leading to personal injury and property damage. She seeks damages from Defendants for violation of the Missouri Merchandising Practices Act, breach of the implied warranty of habitability, and negligence. (Doc. 98.) Defendants have moved for summary judgment on all claims. (Doc. 139.)

### I. Non-Compliance with Local Rule 56.1

As an initial matter, the Court notes that Defendants failed to comply with Local Rule 56.1(c) when filing their reply in support of their motion for summary judgment. Local Rule 56.1 sets out the manner in which a motion for summary judgment, opposing suggestions, and reply suggestions should be filed in this Court, as follows:

> **(a) Supporting Suggestions.** A party moving for summary judgment must begin its supporting suggestions with a concise statement of uncontroverted material facts. Each fact must be set forth in a separately numbered paragraph and supported in accordance with Fed. R. Civ. P. 56(c).

**(b) Opposing Suggestions.**

> **1.** A party opposing a motion for summary judgment must begin its opposing suggestions by admitting or controverting each separately numbered paragraph in the movant's statement of facts. . . . Unless specifically controverted by the opposing party, all facts set forth in the statement of the movant are deemed admitted for the purpose of summary judgment.

> **2.** If the opposing party relies on any facts not contained in the movant's suggestions, the party must add a concise listing of material facts. Each fact in dispute must be set forth in a separately numbered paragraph and properly supported in accordance with Fed. R. Civ. P. 56(c).

**(c) Reply Suggestions.** The party moving for summary judgment may file reply suggestions. In those suggestions, *the party must respond to the non-moving party's statement of additional facts in the manner prescribed in Rule 56.1(b)(1)*. Unless specifically controverted by the moving party, all facts set forth in the statement of the opposing party *are deemed admitted* for the purpose of summary judgment.

Local Rule 56.1 (emphasis added). "These requirements help to 'distill to a manageable volume the matters that must be reviewed by a court undertaking to decide whether a genuine issue of fact exists for trial.'" *Nelson v. S. Poverty L. Ctr.*, 513 F. Supp. 3d 1101, 1106 (W.D. Mo. 2021) (quoting *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990 (8th Cir. 2006)) (discussing Local Rule 56.1 and Fed. R. Civ. P. 56).

Defendants failed to properly respond to Plaintiff's additional statement of material facts in the manner prescribed by the Local Rules. Plaintiff's suggestions in opposition to Defendants' motion for summary judgment included 36 numbered paragraphs of additional facts. (Doc. 145 at 23-33.) Defendants' reply suggestions do not contain 36 separately numbered paragraphs admitting or controverting each of Plaintiff's additional statements of material fact. (*See generally* Doc. 148.) While Defendants attempt to challenge some of Plaintiff's additional factual assertions in their reply brief, they improperly blend legal arguments with challenges to Plaintiff's factual assertions. *See Nelson*, 513 F. Supp. 3d at 1106 (adopting defendant's statement of uncontroverted material facts as true for purposes of summary judgment where Nelson failed to respond to it by numbered paragraphs and instead "blend[ed] his arguments with his assertions of facts").

Accordingly, for purposes of summary judgment, the Court deems admitted Plaintiff's additional statement of material facts.[1]

## II. Summary Judgment Background and Facts[2]

Plaintiff Rebecca Kintz moved into Apartment 1013 at The Haven at Shoal Creek (the "Apartment") in July 2022. The Haven is an apartment complex owned and managed by Defendants.

### A. Plaintiff's Apartment, Work Orders, and Mold Inspections

Plaintiff took steps to keep the Apartment clean, and she reported water intrusions and mold events. Specifically, Plaintiff submitted three separate work orders relating to water intrusions in her Apartment, which were dated August 2, 2022, August 1, 2023, and December 4, 2023. The August 1, 2023, work order complaint was that "[t]he woodwork in the corner of the living room is stained from a leak. There is evidence on the wall on the porch where water has drained down from the ceiling." (Doc. 145-10 at 12.) Work was not completed on Plaintiff's August 1, 2023 work order until August 17, 2023. Defendants' response consisted of cleaning out the "condensation line"[3] and having a contracted painter paint the baseboard which suffered water damage. Defendants did not remove water-damaged materials, did not moisture-test the wall cavity, and did not apply antifungal treatment. Plaintiff's third water-related work order dated December 4, 2023, complained of mold in the washing machine. (Doc. 145-10 at 18.)

Plaintiff engaged Nick's Inspection Services ("Nick's") to conduct mold testing in the Apartment. Nick's inspection occurred on November 30, 2023, and Nick's issued a report thereafter. Nick's testing and report concluded that there was aspergillus/penicillium inside the

---

[1] To the extent Plaintiff's additional statement of material facts controverts Defendants' statement of facts, the Court notes these contradictions for clarity in the case moving forward.

[2] Except where otherwise noted, these facts are taken from the parties' statements of uncontroverted facts. The Court has omitted facts properly controverted, facts asserted that are immaterial to the resolution of the pending motion, facts asserted that are not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

[3] The evidence referenced does not further clarify what "condensation line" refers to.

3

Apartment at more than twice the outdoor concentration.[4] (Doc. 145-6 at 2.)[5] Nick's also detected a higher than baseline amount of stachybotrys (another mold) inside the Apartment, with none detected in the outdoor sample.

Around this time, Plaintiff informed Defendants that she intended to move out of the Apartment due to the presence of mold.[6] Defendants also learned that Plaintiff had engaged Nick's to conduct mold testing in the Apartment. Defendants investigated Plaintiff's mold concerns and retained APEX Environmental Consultants, Inc. ("APEX") to investigate conditions in Plaintiff's Apartment. APEX conducted an inspection of the Apartment on December 13, 2023, and produced a report of its findings. APEX's bioaerosol sampling of the Apartment indicated no significant concentrations of airborne fungal spores in most areas of the Apartment. The guest bedroom, however, showed elevated spore counts. The APEX report stated that "[t]he visual inspection indicated no evidence of visible fungal growth" in the Apartment.[7]

Plaintiff vacated the Apartment in January 2024.

**B.      Plaintiff's Health**

Plaintiff was generally healthy before moving into The Haven. After moving into her Apartment, Plaintiff's health rapidly deteriorated. Plaintiff's CT imaging from November 19, 2021 (approximately eight months before she moved into the Apartment) showed "completely normal" lungs with no evidence of lung disease. By September 13, 2022 (two months after Plaintiff moved into The Haven), early abnormalities consistent with infection appeared in CT imaging of Plaintiff's lungs, and by April 23, 2023, disease had "dramatically progressed."

---

[4] Aspergillus is a common mold which can cause infections such as aspergillosis when an individual breathes in airborne spores of aspergillus. *See Aspergillosis Basics*, CDC (Apr. 24, 2024), https://www.cdc.gov/aspergillosis/about/index.html [https://perma.cc/SR9Y-8ZY6].

[5] Specifically, the report indicates that there were 87 count/$m^3$ (that is, per cubic meter) of Aspergillus/Penicillium in Plaintiff's Apartment sample compared to 40 count/$m^3$ in the baseline sample taken outside the Apartment.

[6] It is not clear from the record when Plaintiff first informed Defendants she believed there was mold in the Apartment. Her December 4, 2023, work order stated "[t]here is mold on and in the washer gasket." (Doc. 145-10 at 18.) Thus, it appears Defendants were informed of Plaintiff's belief at least as of December 4, 2023.

[7] Plaintiff contests the adequacy and accuracy of APEX's inspection and subsequent report because, *inter alia*, a HEPA 700 air scrubber was running in the Apartment prior to the inspection. The Court includes the results of the inspection herein not for the truth of the findings, but for the fact that such findings were made by APEX.

Ultimately, Plaintiff had more than thirteen rounds of antibiotics, sinus surgery, pneumonia, multiple bronchoscopies, a diagnosis of invasive pulmonary aspergillosis in October 2023,[8] and the development of bronchiectasis and hypogammaglobulinemia requiring monthly intravenous immunoglobulin infusions. Dr. Kyle Brownback opines that Plaintiff's invasive pulmonary aspergillosis occurred due to exposure to aspergillus. He also opines that Plaintiff developed bronchiectasis as a result of her invasive pulmonary aspergillosis, and that her bronchiectasis will require ongoing management from specialized physicians and multiple treatments and medications for an indefinite period.

In addition to Plaintiff's health issues which began after she moved into the Apartment, friends of Plaintiff who visited her and stayed briefly at the Apartment developed respiratory and sinus issues after their visits.

## C.      The Haven's Mold-Response Policies

Defendants maintain an Operations and Management Plan which requires employees at The Haven to respond to all water intrusion and mold events "within 24 hours," maintain a mandatory Mold Incident Tracking Log, and conduct follow-up inspections after water events. Maintenance Technician Zach Hodges testified at his deposition that responding to water intrusions was an urgent matter because water leads to mold if it is allowed to sit for long enough. However, as discussed above, Defendants failed to follow their policy to respond to water intrusions within 24 hours, and took two weeks to respond to Plaintiff's August 1, 2023 work order reporting a water intrusion, and responded by painting over the water-damaged area.

Defendants' General Manager, Kelly Washington, admitted in testimony at her deposition that she did not maintain the required Mold Incident Tracking Log. Defendants' Assistant Manager Jason McMichael—who has been an employee at The Haven since February 2020 and who was designated as Defendants' corporate representative on the topic of mold complaints at The Haven—testified at the Rule 30(b)(6) deposition that he had never seen the Operations and

---

[8] Defendants contest the diagnosis of invasive aspergillosis with expert testimony of Dr. Salzman. As discussed above, Defendants did not properly controvert the foregoing fact listed in Plaintiff's additional statement of facts and it is adopted as true for purposes of summary judgment. The Court nevertheless addresses the competing expert opinions in its analysis below and notes that this issue remains controverted for purposes of trial.

Management Plan or any mold incident tracking log, and that he was unaware of any mold complaints other than Plaintiff's.

Dr. Georgi Popov, a Qualified Environmental Professional and Certified Safety Professional retained by Plaintiff, opines that the apartment units at The Haven were not maintained in a safe, healthy, and professionally managed manner based on his review of Defendants' awareness of and compliance with their own Operations and Management Plan. (Doc. 145 at 26, ¶ 10.)

### D. Previous Mold Issues at The Haven

The Haven experienced multiple water intrusion and mold issues in the past. General Manager Washington admitted that condensing and leaking HVAC units are a "common issue" at The Haven.[9] Maintenance Technician Hodges confirmed this problem had affected more than ten unit during his time at The Haven. Other employees reported finding mold in HVAC closets to General Manager Washington after routine preventative maintenance visits. Defendants also received complaints of mold from other tenants at The Haven. This included complaints of mold in apartment units in Plaintiff's building. (Doc. 145-17 (complaints of mold in units 1018, 1027, and 1029).) These complaints included that "[m]old is all over the walls in the HVAC closet," (unit 1027), there is "mold behind the toilet . . . from a previous leak from the patio HVAC closet," (unit 1018), and that "[m]old has grown all over in the HVAC closet, and on the adjoining walls inside the apartment," (unit 1029). (*Id.*)

Further facts are set forth below as necessary.

### Discussion

### I. Defendants' Motion for Sanctions for Spoliation of Evidence (Doc. 134)

The Court begins with Defendants' motion for sanctions for spoliation of evidence. The motion centers on materials that Plaintiff discarded before this litigation was filed. Defendants refer to an at-home mold test Plaintiff conducted and personal belongings that Plaintiff discarded, including porous furnishings, air-filtration devices, and CPAP-related materials. (Doc. 134 at 1-3.) The Court notes at the outset that it appears neither that Plaintiff attempts to rely on any of the

---

[9] HVAC units are present in each apartment in a closet. It appears that those closets remain locked and tenants cannot access them without requesting that someone in Defendants' employment unlock the door. (*See* Doc. 145-10 at 18 (requesting someone come turn off light in HVAC closet); *id.* at 19 (requesting to send someone over to open HVAC closet).)

6

discarded items in opposing summary judgment, nor that Defendant is requesting that the Court itself draw a negative inference from the alleged spoliation at the summary judgment phase. As best as the Court can discern, Defendants' motion for sanctions for spoliation of evidence is simply a pre-trial motion in limine. Because the issue is fully briefed and ripe for this Court's consideration, the Court will address it at this juncture.

Defendants argue that the discarded items should have been preserved because they were central to testing Plaintiff's mold exposure, causation, and damages theories. (*Id.* at 6-7.) Defendants further contend that the timing and circumstances of Plaintiff's disposal of the items show bad faith and prejudiced their ability to test Plaintiff's claims. (*Id.* at 1-3, 6-7.)

Plaintiff responds that the items were discarded during remediation and move-out after she received advice from Nick's, a mold remediation company, that contaminated materials that could not be cleaned should be removed and discarded. (Doc. 138 at 5-6, 10-12.) Plaintiff also argues, *inter alia*, that Defendants cannot show prejudice because they had access to the Apartment while her belongings remained there, retained their own inspector, and did not request that any belongings be preserved or tested before they were discarded. (*Id.* at 6-7, 10-12.)

Defendants ask the Court to (1) impose an adverse-inference instruction that the discarded items would have been unfavorable to Plaintiff's claims, (2) preclude Plaintiff and her experts from offering testimony or argument that any of the discarded items were contaminated with mold or that testing those items would have supported her claims, and (3) award attorney fees and costs incurred in connection with this motion. (Doc. 134 at 2.)

### A. Adverse-Inference Instruction

Federal courts have "inherent power" to impose sanctions for spoliation of evidence. *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004). "The obligation to preserve evidence begins when a party knows or should have known that the evidence is relevant to future or current litigation." *Zamora v. Stellar Mgmt. Grp.*, No. 3:16-cv-05028-RK, 2017 WL 1362688, at *2 (W.D. Mo. Apr. 11, 2017); *see also White v. Jefferson City Mo. Police Dep't*, No. 2:21-cv-04189-NKL, 2022 WL 2135829, at *2 (W.D. Mo. May 13, 2022).

For an adverse-inference instruction to be warranted, the Court must "make two findings: (1) there must be a finding of intentional destruction indicating a desire to suppress the truth, and (2) there must be a finding of prejudice to the opposing party." *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 463 (8th Cir. 2016) (internal quotation marks omitted). "The

ultimate focus for imposing sanctions for spoliation of evidence is the intentional destruction of evidence indicating a desire to suppress the truth, not the prospect of litigation." *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007). "Intent is rarely proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses," and other relevant circumstances. *Id.* (quoting *Morris v. Union Pac. R.R.*, 373 F.3d 896, 902 (8th Cir. 2004)).

Assuming *arguendo* that Plaintiff had a duty to preserve the discarded materials and the disposal caused prejudice, Defendants have not shown that Plaintiff discarded the materials with a desire to suppress the truth. Although Plaintiff deliberately discarded the materials, deliberate discarding or destruction of evidence does not by itself establish the intent required for an adverse-inference instruction. *See Burris v. Gulf Underwriters Ins.*, 787 F.3d 875, 879-80 (8th Cir. 2015) (affirming denial of an adverse-inference instruction where evidence showed that records were intentionally destroyed, but did not establish that the records were destroyed to suppress the truth).

The record indicates that Plaintiff discarded her belongings during remediation and move-out after Nick's advised her concerning the removal or disposal of materials that could not be cleaned. (Doc. 138 at 5-6, 10-12; Doc. 138-1 at 6-10; Doc. 138-6 at 9-11.) The disposal does not appear to have been selective; it included a broad range of personal property, some of which Plaintiff photographed before disposal. (Doc. 138 at 6-7, 10-12; Doc. 138-1 at 6-10.) Plaintiff disclosed the disposal of personal items in her Complaint and later testified about it. (Doc. 1 at 9, ¶ 20; Doc. 98 at ¶ 20; Doc. 138-1 at 6-10.) Nor does the record indicate that Plaintiff discarded the at-home test materials because the test was unfavorable or to prevent Defendants from learning that testing had occurred. Plaintiff disclosed that she performed the at-home test but discarded it, and then Plaintiff thereafter obtained Nick's mold inspection and report, which she has provided to Defendants in this lawsuit. (Doc. 138 at 5, 10-12; Doc. 138-1 at 15-18.)

Taken together, these circumstances do not show that Plaintiff discarded the materials with a desire to suppress the truth. *See Simon v. Select Comfort Retail Corp.*, No. 4:14-CV-1136 JAR, 2016 WL 160643, at *2 (E.D. Mo. Jan. 14, 2016) (finding no indication of desire to suppress the truth where Simon discarded allegedly mold-contaminated components of his bed, despite having contemplated filing a lawsuit prior to discarding the components and notwithstanding the defendant's lost opportunity to inspect the components). It appears that Plaintiff discarded the items at the advice of a mold-remediation professional for the purpose of removing allegedly

contaminated items from her living environment, rather than upon any intent to suppress the truth. Thus, Defendants have not established the intent to suppress the truth required for an adverse-inference instruction, and their request for an adverse-inference instruction is **DENIED**. *See Lincoln Composites*, 825 F.3d at 463 (requiring intent to suppress the truth for an adverse-inference instruction).

### B. Exclusion of Evidence

The absence of intent to suppress the truth does not foreclose all the relief Defendants seek, however. *See Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993); *see also Stevenson*, 354 F.3d at 747 n.2. An exclusion-type relief may be considered where the responsible party knew or should have known the evidence was relevant to potential litigation. *Dillon*, 986 F.2d at 267; *see also Stevenson*, 354 F.3d at 747 n.2 ("In *Dillon* . . . we affirmed the imposition of sanctions (mainly the exclusion of evidence) for the destruction of evidence where there was no bad faith finding regarding the spoliation of evidence but only a finding that the spoliators . . . knew or should have known that the evidence would be relevant to imminent litigation." (internal quotation marks omitted)).

"[T]o establish that exclusion of evidence is appropriate due to spoliation of evidence, there must be findings that (1) the destroying party knew or should have known that the evidence was relevant to imminent litigation . . . and (2) the other party was prejudiced by the destruction of evidence." *Dynasteel Corp. v. Black & Veatch Corp.*, No. 08-cv-0602-ODS, 2010 WL 11508641, at *2 (W.D. Mo. Mar. 18, 2010). Because Plaintiff alleges that toxic mold was present in her Apartment and that it required cleaning, remediation, and disposal of personal property, the discarded belongings are clearly relevant to Plaintiff's claimed mold contamination, causation, and damages. By the time Plaintiff moved out of the Apartment and discarded various belongings in January 2024, Plaintiff had obtained an at-home mold test result, retained Nick's Inspection Service, received Nick's mold inspection report, informed Defendants of her mold allegations, and contacted Defendants through counsel. (Doc. 134 at 3; Doc. 138 at 5-7, 10-12; Doc. 138-1 at 6-10, 15-18; Doc. 138-6 at 9-11.) By then, Defendants had also retained APEX to inspect the Apartment. (Doc. 138 at 5-6, 13-14; Doc. 138-7 at 4; Doc. 138-8 at 1-2.) In short, by the time of disposal, the alleged mold condition had been tested, documented, raised with Defendants, addressed through counsel, and treated by both sides as warranting third-party inspection. Under those circumstances, the Court finds that Plaintiff knew or should have known that discarded

9

personal belongings she now claims were contaminated could be relevant to imminent litigation regarding the existence and extent of contamination, causation, or damages.

Before excluding discarded evidence or testimony regarding it, the Court must also find that the destruction prejudiced the opposing party. *Dillon*, 986 F.2d at 267. Prejudice exists where the lost evidence was "relevant and unavailable through other sources." *Peterson v. Washington County*, No. 18-cv-2640 (DWF/ECW), 2021 WL 2686119, at *3 (D. Minn. June 30, 2021) (citing *Koons v. Aventis Pharm., Inc.*, 367 F.3d 768, 780 (8th Cir. 2004)). Plaintiff argues that Defendants are not prejudiced because they hired a company to inspect the Apartment on their behalf. Defendants had notice of Plaintiff's mold allegations, possessed Nick's report by December 6-7, 2023, retained APEX, and had APEX inspect the Apartment while Plaintiff's belongings remained there. (Doc. 138 at 5-6, 13-14; Doc. 138-7 at 4; Doc. 138-8 at 1-2.) *See Int'l Ins. Co. of Hannover Ltd. v. IEA Renewable Energy, Inc.*, No. 17-06143-CV-SJ-GAF, 2020 WL 8673135, at *3-5 (W.D. Mo. Sept. 30, 2020) (finding no prejudice where the movants had meaningful onsite access, substantial substitute evidence, and an opportunity for further inspection).

However, Defendants' pre-disposal access and testing was meaningful only with respect to the Apartment environment, but not with respect to item-specific testing of the discarded belongings that Plaintiff now claims were contaminated with mold. (Doc. 138-7 at 4-11.) The Court does not equate access to the Apartment with a meaningful opportunity to perform item-specific testing of Plaintiff's personal belongings. And now no such testing is possible because Plaintiff has discarded those items. Thus, Defendants do not have the opportunity to inspect the discarded belongings and mount a defense as to Plaintiff's assertions that those belongings were infested with mold. *See Bass v. Gen. Motors Corp.*, 929 F. Supp. 1287, 1289-90 (W.D. Mo. 1996) (finding prejudice where photographs, video, and retained component evidence did not substitute for inspection of destroyed evidence relevant to the defense theory).

Accordingly, though Defendants were able to conduct testing of the Apartment itself and Plaintiff took photographs of some of the discarded items, this evidence is not a substitute for actual inspection of the discarded items and does not eliminate the prejudice caused to Defendants. *Id.* Limited preclusion of the discarded evidence and testimony regarding the same is therefore appropriate. *See Koons*, 367 F.3d at 780; *Dillon*, 986 F.2d at 267 ("Sanctions are appropriately levied against a party responsible for causing prejudice when the party knew or should have known

10

that the destroyed documents were relevant to pending or potential litigation.") (quoting *Capellupo v. FMC Corp.*, 126 F.R.D. 545 (D. Minn. 1989)).

The Court thus **GRANTS** Defendants' request for preclusion of certain evidence. Because the prejudice is limited to Defendants' inability to test the discarded items themselves, exclusion is likewise limited to testimony or argument that depends on or suggests what those unavailable items would have shown. *See Bass*, 929 F. Supp. at 1290 (barring testimony about a car and seatbelt inspection where Bass failed to preserve the vehicle and defendant did not have an opportunity to inspect it).[10] More specifically, at trial, Plaintiff and her experts are precluded from offering testimony or argument that any of the discarded items were contaminated with mold or that testing those items would have supported her claims, and plaintiff counsel is precluded from making arguments or inferences of the same.[11] This ruling does not bar testimony or expert opinion based on independent evidence properly produced in discovery, including other apartment testing, photographs, remediation records, retained personal property, or otherwise admissible observations. Accordingly, Defendant's motion for sanctions for spoliation of evidence is **GRANTED in part** and **DENIED in part**.

### C. Attorney Fees

A bad-faith finding is specifically required in order to assess attorney fees under the Court's inherent power to sanction. *See Stevenson*, 354 F.3d at 751. Because the record does not establish bad faith, Defendants' request for attorney fees related to the motion for sanctions for spoliation is **DENIED**.

---

[10] The Court notes that in *Bass* the court also permitted an adverse-inference instruction, despite no finding of bad faith. However, consistent with the Court's analysis above, Defendants have not shown an intent to suppress the truth which is necessary for an adverse-inference instruction under more recent Eighth Circuit caselaw. *See Lincoln Composites, Inc.*, 825 F.3d at 463 (requiring showing intent to suppress the truth for adverse-inference instruction for spoliation).

[11] The Court's in-limine ruling is preliminary and is subject to revision based on future developments in the case and evidence presented at trial. In addition, the Court notes that although the instant motion implicates the Court's inherent power to sanction for spoliation of evidence, the Court also notes that exclusionary remedies are available for non-production of evidence during discovery under the Federal Rules of Civil Procedure. For example, Rule 26(a) requires disclosure of "all tangible things that the disclosing party has in its possession . . . and may use to support its claims or defenses," while Rule 37(c) precludes parties from using information not disclosed pursuant to Rule 26(a) in support of a motion, at a hearing, or at trial.

## II.    Defendants' Motion for Summary Judgment (Doc. 139)

Defendants move for summary judgment arguing that Plaintiff cannot establish medical causation as to any of her claims, and that Plaintiff has failed to show evidence supporting particular elements of each claim.  Plaintiff responds that issues of material fact remain as to medical causation—specifically arising from the expert opinion of Plaintiff's retained expert, Dr. Kyle Brownback—and that evidence in the record supports each of her claims.  The Court generally finds that issues of material fact remain as to all of Plaintiff's claims.  Notably, there are competing expert medical opinions regarding Plaintiff's diagnosis of invasive aspergillosis, what caused it, and what the effects of that diagnosis are, as well as competing mold inspection reports from Plaintiff's Apartment.

### A.    Legal Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In this context, a fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In applying this standard, the Court must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Recio v. Creighton Univ.*, 521 F.3d 934, 938 (8th Cir. 2008).  Thus, the relevant inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.

### B.    Medical Causation

Underlying each of Plaintiff's claims and the damages she seeks is the theory that her exposure to toxic mold in her Apartment caused personal injury including a diagnoses of invasive aspergillosis and the after-effects of that disease.  Defendants argue that Plaintiff cannot establish medical causation because "(1) Plaintiff does not have invasive aspergillosis; (2) even if she did, there is no evidence linking it to mold in the Apartment; and (3) any mold-related symptoms were limited to temporary allergic reactions that resolved upon leaving the Apartment."  (Doc. 140 at 6.)

In toxic tort cases, Missouri law requires the plaintiff "to establish both general and specific causation in order to make a submissible case." *McCostlin v. Monsanto*, 718 S.W.3d 435, 442 (Mo. Ct. App. 2025). "General causation refers to whether an injury can be caused by a certain process," while "[s]pecific causation refers to whether the particular plaintiff's injury was caused by that process." *Id.* (quoting *Huett v. Branson*, 675 S.W.3d 514, 521 (Mo. Ct. App. 2023)). "Proof of causation related to mold claims requires scientific expertise." *Simon*, 2016 WL 160643, at *9 (citing *Brown for Est. of Kruse v. Seven Trails Investors, LLC*, 456 S.W.3d 864, 870 (Mo. Ct. App. 2014)).

Here, Defendants do not contest that exposure to mold, particularly aspergillus, can cause invasive pulmonary aspergillosis. Instead, Defendants argue that Plaintiff cannot establish that mold caused her particular injuries. In doing so, Defendants wholly ignore the evidence and testimony of Plaintiff's retained experts, representing to the Court that the evidence and testimony of their expert—Dr. Salzman—is uncontroverted. It is only in their reply brief, after Plaintiff controverts Dr. Salzman's testimony with evidence of her own experts, that Defendants address the issue of competing expert testimony by arguing that Dr. Brownback's expert testimony should be disregarded for failing to satisfy the *Daubert* standard. The Court is not persuaded by Defendant's attempt to bootstrap a *Daubert* argument which Plaintiff has not had the benefit of responding to in a reply brief, especially after Defendants completely ignored the existence of Plaintiff's expert in their opening brief seeking summary judgment.

The Court concludes that sufficient issues of material fact remain as to medical causation. Defendants' first argument—that Plaintiff does not have invasive pulmonary aspergillosis— clearly remains controverted.[12] Defendants' expert, Dr. Salzman, opines that there is not adequate support in Plaintiff's medical records for a diagnosis of invasive aspergillosis. (Doc. 140 at 77, 81.) Dr. Salzman also noted that Plaintiff's galactomannan test results were below 1, which is not diagnostic of invasive aspergillosis in a patient like Plaintiff who does not have classic high-risk conditions like bone marrow transplant or cancer. Dr. Salzman notes that there were also never

---

[12] Defendants admit that "[i]n October 2023, Plaintiff was diagnosed with aspergillosis after aspergillus was found in her lungs." (Doc. 140 at 2, ¶ 6.) While neither party fleshed out the particulars of aspergillosis, the Court notes that it generally presents in two ways—invasive pulmonary aspergillosis and chronic pulmonary aspergillosis. Based on Defendant's own statement of uncontroverted facts, it appears that the contest is then whether Plaintiff's aspergillosis is "invasive" or "chronic."

13

any positive cultures from a biopsy for aspergillus from either Plaintiff's sinuses or lungs. (*Id.* at 82.)

Plaintiff's expert, Dr. Brownback, on the other hand, opines that "to a reasonable degree of medical certainty . . . Rebecca Kintz developed invasive pulmonary aspergillosis in 2023." (Doc. 145-4 at 8.) Dr. Brownback opines that Plaintiff was at a heightened risk for developing invasive aspergillosis due to being immunosuppressed related to her hypogammaglobulinemia and that she was diagnosed with invasive aspergillosis because she was exposed to aspergillus. (*Id.* at 6.) Dr. Brownback further explained that under ideal circumstances a lung biopsy would be done to confirm aspergillus tissue in the lungs, but this was not possible for Plaintiff due to her elevated bleeding risk from the use of an anticoagulation to reduce stroke risk associated with her history of atrial fibrillation.[13] Instead, in Plaintiff's case, a galactomannan antigen was tested from alveolar lavage fluid. He relies on the positive galactomannan assay from the alveolar lavage fluid as confirmation of Plaintiff's invasive aspergillosis diagnosis. (*Id.* at 6-7.)[14] He also relies on improved CT scans of Plaintiff's lungs after treatment with Cresemba, an antifungal drug.[15] (*Id.* at 7.) The Court finds a triable issue of fact as to Plaintiff's diagnosis of invasive aspergillosis.

Next, Defendants argue that even if Plaintiff has invasive aspergillosis, there is no evidence linking it to mold in the Apartment. Defendants argue that aspergillus is ubiquitous in the environment and Plaintiff could have come into contact with it anywhere.[16] Moreover, they appear to argue that there is no evidence of mold in the Apartment, relying on the APEX report. However, as discussed above, Plaintiff retained Nick's to conduct its own inspection of her Apartment, and Nick's concluded that the levels of aspergillus in the Apartment were twice the amount as in a

---

[13] It is not clear from the record whether a sinus biopsy was conducted, and if not, whether this was due to similar reasons for why a lung biopsy was not conducted.

[14] In his report, Dr. Brownback further explains that the galactomannan assay detects major constituents of the Aspergillus cell and is more sensitive to detect invasive aspergillosis than fungal cultures. (Doc. 145-4 at 6.)

[15] "Cresemba . . . is an azole antifungal indicated for the treatment of invasive aspergillosis and invasive mucorymycosis." *Navigate Antifungal Treatment with CRESEMBA*, https://www.cresemba.com/ [https://perma.cc/NF26-MSTT].

[16] Defendants also argue that Dr. Brownback admits that aspergillus exposure through common house plants is possible. (Doc. 148 at 5.) However, in Plaintiff's additional statement of uncontroverted facts, which the Court accepts as true for purposes of summary judgment, Plaintiff states that she had no houseplants in the Apartment. (Doc 145 at 25, ¶ 5.)

baseline outside sample. Moreover, Plaintiff raises issues as to the accuracy and reliability of the APEX report, including that a HEPA air scrubber (meant to remove mold spores from the air) was running in the Apartment just prior to APEX's inspection. The foregoing evidence raises an inference that it was the heightened level of aspergillus in her Apartment, rather than the lower level of aspergillus in the baseline sample, which caused her invasive aspergillus. At summary judgment, "[t]he non-moving party receives the benefit of all reasonable inference supported by the evidence." *Sturgeon v. Faughn*, 36 F.4th 804, 808 (8th Cir. 2022); *see also Brown*, 456 S.W.3d at 873 (drawing reasonable inferences in favor of non-movant and concluding sufficient evidence of causation to avoid summary judgment where expert opined exposure to mold worsened respiratory problems where medical conditions improved upon vacating an apartment).[17]

Finally, Defendants argue that any mold-related symptoms were limited to mild allergic reactions which abated when Plaintiff left the Apartment. Again, Defendants rely heavily on their own expert testimony while disregarding Plaintiff's expert. Dr. Salzman opined that it is "likely" Plaintiff "had allergic reactions manifested by runny nose, watery eyes, and cough due to exposure to mold at her residence" and that such symptoms would resolve when she was no longer exposed to mold. (Doc. 140 at 78.)[18] Plaintiff's expert testimony directly contradicts this proposition. Dr. Brownback opines that Plaintiff developed bronchiectasis as a result of her invasive aspergillosis, and that this condition will more likely than not require ongoing management from specialized physicians with multiple treatments and medications for an infinite period. Dr. Ameet Deshmukh also opines that Plaintiff requires, *inter alia*, lifelong monthly immunoglobulin infusion therapy, ongoing antibiotics, and specialist care due to her invasive aspergillosis and its after-effects.

Thus, Defendants' and Plaintiff's experts provide competing testimony regarding medical causation and the long-term effects of Plaintiff's alleged mold exposure. "In determining whether summary judgment is proper, the court should not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *First Baptist Church v. Zurich Am. Ins.*, 129 F.4th 488, 493 (8th Cir. 2025) (internal quotation marks omitted). Thus, the Court

---

[17] In *Brown*, the court also stated that the identity of the toxic substance (*i.e.*, the particular type of mold) and the connection between exposure to that substance and the harmed suffered can be shown by *circumstantial evidence*. *Id.*

[18] Notably, at this point in Defendants' expert report, their own expert attributes Plaintiff's symptoms to "*mold at her Residence*."

finds that Plaintiff has established a sufficient issue of material fact as to medical causation, and Defendants' motion for summary judgment on this point is **DENIED**.

### C. Missouri Merchandising Practices Act ("MMPA")

Plaintiff's MMPA theory contends that Defendants held out The Haven as a safe and professionally managed apartment complex, when in actuality it suffered from mold infestation. Defendants argue that Plaintiff's MMPA claim fails as a matter of law because (1) Plaintiff cannot establish any deceptive or unfair practice; (2) Plaintiff cannot establish ascertainable loss caused by any deceptive or unfair practice; and (3) Plaintiff cannot prove a reasonable consumer would have been misled.

The MMPA makes unlawful "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise . . . ." Mo. Rev. Stat. § 407.020.1. "The term 'merchandise' includes 'intangibles, real estate or services." *Cheatem v. Landmark Realty of Mo., LLC*, No. 20-cv-00958-BP, 2022 WL 5144772, at *3 (W.D. Mo. July 1, 2022) (quoting Mo. Rev. Stat. § 407.020.1). Plaintiff must prove four initial elements to prevail on a claim under the MMPA: that she "(1) purchased merchandise . . . from defendants; (2) for personal, family or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful" under the MMPA. *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 311 (Mo. Ct. App. 2016) (citing *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 773 (Mo. banc 2007)). Moreover, following the 2020 amendments to the MMPA, Plaintiff must also establish:

> (a) That the person acted as a reasonable consumer would in light of all circumstances; (b) That the method, act, or practice declared unlawful by section 407.020 would cause a reasonable person to enter into the transaction that resulted in damages; and (c) Individual damages with sufficiently definitive and objective evidence to allow the loss to be calculated with a reasonable degree of certainty.

Mo. Rev. Stat. § 407.025.2; *see Diesel v. Mariani Packing Co., Inc.*, No. 4:22-cv-01368-AGF, 2024 WL 4263944, at *4 (E.D. Mo. Sept. 23, 2024) (discussing 2020 amendments to MMPA, and collecting cases which have required proving the three elements from the amendments and the original four elements from the pre-amendment MMPA).

### 1. Deceptive or Unfair Practice under the MMPA

Plaintiff alleges that Defendants made false representations about the living conditions at The Haven, specifically that they were professionally maintained and safe. Defendants argue that

16

the undisputed evidence shows no basis for such claims, i.e., that there is no evidence of mold in the Apartment. Defendants rely on (1) the APEX report (which found no increased levels of mold in the air in most parts of the Apartment and no visible fungal growth in the Apartment) and (2) Mr. John P. Jurgiel's testimony endorsing APEX's conclusions and methodology and opining there is no basis to conclude that Defendants' portrayal of the property as professionally managed and safe was false.

Mr. Jurgiel is a certified industrial hygienist retained by Defendants as an expert witness. He provides testimony as to the significance of finding double the amount of aspergillus/penicillium inside the Apartment compared to outdoors, explaining that while the counts were numerically higher inside, that the levels were too low to be significant. However, as discussed above, Plaintiff's independently retained inspection company concluded that there was two times the amount of aspergillus/penicillium inside the Apartment (compared to an outdoor sample) and that there was stachybotrys which was not present outside at all. Plaintiff's expert Dr. Popov disagrees with Mr. Jurgiel and opines that the presence of aspergillus in the Apartment at twice the outdoor concentration, as well as the presence of stachybotrys, is evidence of a mold source inside the Apartment. (Doc. 145-2 at 3.) Moreover, Plaintiff took photographs that allegedly show mold in the Apartment. (*See* Doc. 145-18.).

Therefore, the Court finds that issues of material fact remain as to the existence of mold in the Apartment and thus whether Defendants misrepresented the conditions of the Apartment.[19]

### 2. Ascertainable Loss Caused by Unlawful Practice

Plaintiff's theory of loss is that because the Apartment was infested with mold, she paid rent for an apartment that was not habitable, and the conditions caused significant damage to her health and property. Defendants argue that because Plaintiff has not proven that her claimed injuries were caused by mold exposure in the Apartment, she cannot establish the "ascertainable loss" element of her MMPA claim.

Having concluded above that Plaintiff has established a sufficient issue of material fact as to the presence of mold in the Apartment, the Court concludes that she has similarly established a

---

[19] Defendants also argue that Plaintiff signed a Mold Information and Prevention Addendum and that this defeats her MMPA claim. However, Plaintiff controverts this fact, showing that the Addendum is a two-page document with its own signature requirement, and that neither Plaintiff nor anyone on behalf of Defendants signed it. Even if Plaintiff had signed this Addendum, its warning on how to *prevent mold* in is not the same as warning a tenant that there *actually is mold* on the premises.

sufficient issue of material fact as to the ascertainable loss element of her MMPA claim. In other words, she has presented evidence which a reasonable jury could conclude that Defendants' conduct caused her loss/injuries. "To prove ascertainable loss, [p]laintiff must show that [defendant] represented the [product] in a way that made it appear to have more value than it actually did." *Stanford v. Samsung Elecs. Am., Inc.*, No. 4:24-cv-00114-BCW, 2025 WL 3724546, at *3 (W.D. Mo. Aug. 20, 2024). Here, Plaintiff has presented evidence which indicates that there were higher mold levels in the Apartment than in the surrounding outdoor environment. This leads to a reasonable inference that the value of a mold infested apartment is less than the value of a mold-free apartment such that Plaintiff has established sufficient evidence on the ascertainable loss issue to survive summary judgment.[20]

### 3. A Reasonable Consumer Would Be Misled

Defendants argue that Plaintiff has identified no particular false statement or misrepresentation, apart from that the property was represented as professionally managed, which was misleading. Defendants further argue that the evidence does not indicate a significant mold problem, so a reasonable consumer would not be misled by Defendants' conduct. Given the Court's findings above regarding issues of material fact as to the existence of mold in Plaintiff's Apartment, Defendants' arguments as to this element are unavailing. The Court concludes that a reasonable juror could conclude that a reasonable consumer would be misled by Defendants' holding out The Haven as professionally managed, if in fact Plaintiff establishes the existence of mold in her Apartment. In other words, a reasonable consumer may be misled into renting a mold-infested apartment where the landlord holds it out as professionally managed, and presumptively mold-free. Defendants' motion for summary judgment on Plaintiff's MMPA claim is **DENIED**.

### D. Breach of the Implied Warranty of Habitability

Defendants argue that Plaintiff's breach of implied warranty of habitability claims fails because (1) the premises were not unsafe or unsanitary; (2) Defendants properly responded upon notice; and (3) any unsafe or unsanitary conditions were de minimis.

---

[20] Moreover, Plaintiff's alleged personal injury losses appear to be cognizable losses under the MMPA. The MMPA precludes actions "for personal injury or death in which a claim can be made under chapter 538," § 407.025(3), which is the chapter regarding tort actions based on improper health care. This exception does not appear to apply here.

18

Under Missouri law, "a landlord impliedly warrants the habitability of leased residential properties." *Detling v. Edelbrock*, 671 S.W.2d 265, 270 (Mo. 1984). To establish a breach of the implied warranty of habitability, Plaintiff must prove: "(1) entry into a lease for residential property; (2) the subsequent development of dangerous or unsanitary conditions on the premises materially affecting the life, health and safety of the tenant; (3) reasonable notice of the defects to the landlord; and (4) subsequent failure to restore the premises to habitability." *Hollifield v. Las Cumbres, LLC*, 655 S.W.3d 238, 242 (Mo. Ct. App. 2022) (quoting *Moser v. Cline*, 214 S.W.3d 390, 395 (Mo. Ct. App. 2007)).

First Defendants argue that the premises were not unsafe or unsanitary, relying on the APEX report finding no visible indication of mold and no significant concentration of airborne mold spores and Mr. Jurgiel's testimony regarding that report. However, as discussed above, Plaintiff has presented evidence which controverts Defendants' statements of fact on this matter. The Court also rejects Defendants' argument that any unsanitary conditions were *de minimis*. *See Herr v. Min Zhao*, 697 S.W.3d 589, 593 (Mo. Ct. App. 2024) (concluding that "mold in the refrigerator," among other things, was a condition that "materially affect[ed] the life, health, and safety of Tenants" and supported a claim for breach of implied warranty of habitability). And, in this case, Plaintiff's allegations are that the alleged mold infestation caused invasive aspergillosis and additional health issues. The Court concludes there is at least a triable issue of fact as to whether the conditions in the Apartment were *de minimis*.

Defendants also argue that they remediated the mold issue upon receiving notice. As set out above, Defendants retained APEX to investigate the Apartment which conducted an inspection on December 13, 2023, and issued a report on December 20, 2023, recommending remediation and to "restrict access to the apartment home" to anyone who is immunocompromised or elderly.[21] (Doc. 140 at 97.) In their statement of uncontroverted material facts, Defendants state that they followed APEX's recommendations for remediation. In doing so, Defendants cite only the APEX report. (Doc. 140 at 97-99.) As Plaintiff points out, this report is not evidence of Defendants' post-report remediation—it only indicated that remediation was recommended. Thus, there is no evidence in the record now before the Court that Defendants conducted any remediation to restore

---

[21] Plaintiff was born in August 1948, (Doc. 140 at 75), and was in her early seventies while living at The Haven.

the Apartment to habitability.[22]  *See Kolb v. DeVille I Props., LLC*, 326 S.W.3d 896, 902 (Mo. Ct. App. 2010) (concluding that the "evidence in the case was sufficient to establish that deVille failed to restore the premises to a habitable condition" where deVille "did not see any bedbugs" and only "sprayed the apartment once with chemicals designed to kill bedbugs" but admitted that multiple sprayings would be necessary to kill any bedbugs).  In *Kolb*, the evidence showed that the property owner had taken *some* steps to address the habitability complaint, but not enough to fully remediate, and this was sufficient to show failure to return the premises to habitability.  Here, there is no such evidence that Defendants remediated the mold.  Defendants' motion for summary judgment on Plaintiff's claim for breach of the warranty of habitability is **DENIED**.

>    **E.    Negligence**

Defendants argue that Plaintiff's negligence claim fails because (1) Plaintiff cannot prove breach of duty and (2) Plaintiff cannot prove causation or damages.  The Court rejects Defendants' argument regarding causation and damages for the reasons previously explained herein.

Plaintiff must establish the following elements to prevail on a negligence claim under Missouri law:  "(1) the defendant had a duty to the plaintiff; (2) the defendant failed to perform that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injury." *Webb v. Medicalodges, Inc.*, 728 F. Supp. 3d 1019, 1024 (W.D. Mo. 2024) (quoting *Martin v. City of Washington*, 848 S.W.2d 487, 493 (Mo. banc 1993)).  Additionally, "[i]n order to establish negligence on the part of a landlord, the plaintiff is required to show that the defendant had either actual or constructive knowledge of the hazardous condition." *Braun v. George C. Doering, Inc.*, 907 S.W.2d 371, 373 (Mo. Ct. App. 1995).[23]

---

[22] Plaintiff also argues that Defendants failed to promptly respond to and address repeated water intrusion issues in the Apartment, referencing Plaintiff's three work orders reporting water events.  The Court notes that there is a distinction between water intrusion and toxic mold contamination.  Defendants were not informed of Plaintiff's belief of mold in her Apartment until around December 4, 2023.  The relevant consideration is what Defendants did to remediate this mold complaint, not Plaintiff's prior complaints about water intrusion.

[23] More generally, landlords do not owe a duty to a tenant and are not liable for personal injury caused by a dangerous condition of the premises. *Caples v. Earthgrains Co.*, 43 S.W.3d 444,449 (Mo. Ct. App. 2001).  However, there are exceptions to this rule, as relevant here, where there is "a hidden dangerous condition" or "where the landlord has a contractual obligation to make repairs and sufficient control or access to the property." *Id.*  Plaintiff signed a residential lease agreement with Defendants which outlines the owners' (Defendants') responsibilities which include making "all reasonable repairs" to the premises.

Defendants argue that Plaintiff has not presented evidence which could establish breach of duty because Defendants did not have knowledge of the alleged mold in Plaintiff's Apartment until December 2023, after which they retained APEX to conduct testing. In *Braun*, a slip and fall case concerning ice in a parking lot, the court found that the defendants had *constructive knowledge* of the iced-over parking lot because (1) "Defendants admitted that they knew a danger existed when snow melted during the day and refroze at night," (2) "Defendants had recognized the danger in the past and had salted the areas of the parking lot near the building when necessary," and (3) despite the foregoing, "on the night at issue, Defendants made no attempt to remedy the potentially dangerous condition." *Id.* at 374. The Court finds *Braun* informative here.

Maintenance Technician Hodges testified that water intrusion demands urgent response and that "[w]ith water comes mold if it sits long enough." (Doc. 145 at 29, ¶ 24.) This indicates that Defendants knew a danger of mold development existed if water intrusion events were not responded to quickly and properly. Second, it appears from the record that Defendants had recognized this danger in the past. Defendants had received recurring water intrusion reports related to units' HVAC closets condensing in at least ten units, and Defendants had received prior mold complaints in other units. Finally, and despite the foregoing, Plaintiff has presented evidence that Defendants did not follow their written mold-response plans, that Defendants failed to respond to water intrusion reports timely, that when Defendants did respond to water intrusion they did not properly remediate the issue, and that Defendants did not test Plaintiff's Apartment for mold prior to her moving in. Plaintiff has produced evidence sufficient to create a triable issue of fact as to Defendants' constructive knowledge of water intrusion and mold development in the Apartment, and thus of Defendants' breach of duty. Defendants' motion for summary judgment as to Plaintiff's negligence claim is **DENIED**.

F.    **Punitive Damages Claim**

Finally, Defendants argue that Plaintiff's claim for punitive damages should be dismissed because (1) they are not liable for the underlying causes of action and (2) the evidence does not establish that Defendants' conduct rose to the level of complete indifference to or conscious

---

(Doc. 140 at 35.) Plaintiff also notes that mold is a hidden condition to the extent it may be present behind walls or vents.

disregard for the safety of others. Defendants' first argument is unavailing given the Court's findings above.

When exercising diversity jurisdiction, the Court applies state substantive law to any state-law claims, which includes punitive damages standards. *See May v. Nationstar Mortg., LLC*, 852 F.3d 806, 813-14 (8th Cir. 2017) (applying Missouri punitive damages standards). "Generally, under Missouri law an award of punitive damages requires a 'willful, wanton or malicious culpable mental state.'" *Chariton Vet Supply, Inc. v. Moberly Motor Co.*, No. 2:08CV47MLM, 2009 U.S. Dist. LEXIS 31873, at *12 (Mo. Ct. App. Apr. 15, 2009) (quoting *May v. AOG Holding Corp.*, 810 S.W.2d 655, 660 n.1 (Mo. Ct. App. 1991)). "For purposes of punitive damages, acting willfully, wantonly, or maliciously is equivalent to acting with a complete indifference to or in conscious disregard for the rights or safety of others." *Rhoden v. Mo. Delta Med. Ctr.*, 621 S.W.3d 469, 481 (Mo. 2021) (quoting *Bell v. Redjal*, 569 S.W.3d 70, 89 (Mo. Ct. App. 2019)). Certain considerations as to whether evidence on punitive damages presents a sufficient issue for jury determination include whether "prior similar occurrences known to the defendant have been infrequent; the injurious event was unlikely to have occurred absent negligence on the part of someone other than the defendant; and, the defendant did not knowingly violate a statute, regulation, or clear industry standard." *Lopez v. Three Rivers Elec. Coop.*, 26 S.W.2d 151, 160 (Mo. 2000).

Here, Plaintiff has presented sufficient evidence to create a triable issue of punitive damages. Specifically, Plaintiff has presented evidence that Defendants disregarded their written Operations and Management Plan, which included water intrusion and mold response guidelines. Plaintiff has presented evidence that Defendants did not maintain the required Mold Incident Tracking Log. Certain employees of Defendants have testified that they have never seen the Operations and Management Plan. And Defendants did not follow the requirement to respond to water and mold events within 24 hours, including as to one of Plaintiff's own complaints of water intrusion on August 1, 2023, which took sixteen days for Defendants to respond to. (Doc. 145 at 30, ¶ 25.) When Defendants responded to this water intrusion, they merely cleaned the condensation line and painted over the water-damaged baseboard. Defendants did not remove water-damaged materials, moisture-test the wall cavity, or apply antifungal treatment. Further, Plaintiff has presented evidence which shows that Defendants were aware of a recurring water intrusion issue with HVAC closets, which has affected at least ten units. Defendants also received

complaints of mold from other residents. (Doc. 145 at 28, ¶ 19 (complaints of mold in units 1018, 1027, and 1029).) All of this was done in the context of Defendants knowing that water intrusion demands urgent response because "[w]ith water comes mold if it sits long enough." (Doc. 145 at 29, ¶ 24.)

On this record, a reasonable juror could find Defendants acted with "complete indifference or conscious disregard for the rights or safety of others." Defendants' motion for summary judgment as to Plaintiff's claim for punitive damages is **DENIED**.

## Conclusion

Accordingly, after careful consideration and for the reasons explained above, the Court **ORDERS** as follows:

(1) Defendants' motion for sanctions for spoliation of evidence, (Doc. 134), **is GRANTED in part** and **DENIED in part**. Accordingly, Plaintiff and her experts are precluded from offering testimony or argument that any of the discarded items were contaminated with mold or that testing those items would have supported her claims, and plaintiff counsel is precluded from making arguments or inferences of the same; and

(2) Defendants' motion for summary judgment, (Doc. 139), is **DENIED**.

**IT IS SO ORDERED.**

/s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: July 6, 2026

23